IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

DECEMBER 1994 SESSION

FILED

December 9, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 03C01-9405-CR-00170 |
| | ) | |
| | ) | Hamilton County |
| v. | ) | |
| | ) | Hon. Stephen M. Bevil, Judge |
| | ) | |
| SHERMAN WINCHESTER BLACKSTOCK, | ) | (Aggravated sexual battery) |
| | ) | |
| Appellant. | ) | |

For the Appellant:                    For the Appellee:

Ardena J. Garth                       Charles W. Burson
District Public Defender              Attorney General of Tennessee
        and                                   and
Karla G. Gothard                      Bates W. Bryan, Jr. and Rebecca J. Stern
Executive District Public Defender    Assistant Attorney General of Tennessee
701 Cherry Street                     450 James Robertson Parkway
Suite 300                             Nashville, TN 37243-0493
Chattanooga, TN 37402-1910
(AT TRIAL)                            Gary D. Gerbitz
                                      District Attorney General
Donna Robinson Miller                         and
Assistant Public Defender             Bates W. Bryan, Jr.
701 Cherry Street                     Rebecca J. Stern
Suite 300                             Assistant District Attorneys General
Chattanooga, TN 37402-1910            600 Market Street
(ON APPEAL)                           Suite 310
                                      Chattanooga, TN 37402

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Sherman Winchester Blackstock, was convicted by a jury in the Hamilton County Criminal Court of aggravated sexual battery, a Class B felony. See T.C.A. § 39-13-504 (1991). The trial court sentenced the defendant as a Range I, standard offender to eight years in the custody of the Department of Correction. In this appeal as of right, the defendant presents the following issues for our review:

> (1) whether there is sufficient evidence to support the jury's determination that the defendant was sane beyond a reasonable doubt;
>
> (2) whether the trial court erred by concluding that the defendant was competent to stand trial;
>
> (3) whether the trial court erred by denying his motion to suppress statements made by the defendant to the police;
>
> (4) whether the trial court erred by denying his post-trial petition for involuntary care and treatment as a mentally retarded offender; and
>
> (5) whether the trial court erred by refusing to sentence the defendant as an especially mitigated offender.

We affirm the judgment of the trial court.

The defendant was tried for the aggravated rape of a seven-year-old girl, L.H., that occurred on August 21, 1992. The victim testified that she walked into the defendant's apartment through the open door and asked for a drink of water. According to the victim, the defendant did not give her a drink of water and instead laid her on the bed. She said that the defendant took off both of their clothes, laid down on top of her, and then penetrated her. The victim said that the defendant told her that he would kill her if she told anyone.

Deborah Earls, the victim's mother, testified that she and her three daughters began living with the defendant after separating from a boyfriend. She said that she had known the defendant several months before he offered to let her stay at

his apartment until she could find someplace else to stay. Ms. Earls testified that she and the defendant were only friends. She also stated that she did not know that the defendant was mentally retarded. According to Ms. Earls, the defendant talked slowly, but she could understand him. She testified that the defendant bathed, washed his own clothes, shopped for groceries, and cooked for himself and for her family. Ms. Earls said that she and her three daughters lived with the defendant off and on for about two months before moving down the street in June 1992 following an argument over the defendant's desire to be more than friends. She admitted that the victim did not tell her anything about the incident when she drove her to a friend's house after the offense occurred. She stated that on Sunday Ms. Earls' friend told her that the victim had said that the defendant had raped her. Ms. Earls testified that when she talked to the victim, she told her that she was hurting and that the defendant "got her bootie."

Ms. Earls testified that someone brought the defendant to her home and she asked him whether he fondled the victim. When the defendant appeared not to understand, she asked him whether he had sex with the victim, and the defendant said, "Yes, what about it." Ms. Earls then told the defendant that she was going to call the police, and the defendant replied that he was going home to sleep.

Officer Tommy Woods of the Chattanooga Police Department testified that he received a call on August 23 around 5:00 p.m. regarding a disorder at 818 East Martin Luther King Boulevard. While he was talking to Ms. Earls and the victim, the defendant, whom Officer Woods did not know, walked up to them. He said that the defendant asked him why he was there. Officer Woods said that he then asked the defendant what he was doing there, and the defendant replied that he knew why Officer Woods was there and that it involved the victim. Officer Woods testified that when he told the defendant that he was there because of the victim, the defendant said that he had done something to the victim once. He said that the defendant made other

3

statements but that Officer Woods could only understand the word "once," which the defendant repeated a couple of times. On cross-examination, Officer Woods admitted that he thought the defendant was "slow."

Tara Pedigo, a detective for the child abuse unit of the Chattanooga Police Department, testified that the victim told her that the defendant played with her "koochie" when she was in the defendant's bedroom playing with toys on the floor. Detective Pedigo testified that before questioning the defendant, she read the defendant his rights by explaining each point in plain language and that the defendant seemed to understand. She stated that she asked the defendant about his education and that he told her that he stopped going to school in the eleventh grade, but he could read and write. She said that the defendant gave his name, phone number and address, but he did not know his social security number. Detective Pedigo stated that the defendant also provided her with inconsistent birthdays: March 31, 1959, and March 21, 1968. She stated that before the defendant signed the waiver of rights form, the defendant stated, "I only did it one time." She testified that she had not told the defendant anything regarding the case before he made the statement. Detective Pedigo also testified that she noticed that the defendant had a speech impediment, but she did not know that he was mentally retarded. According to Detective Pedigo, the defendant did not appear to have difficulty understanding her questions.

On cross-examination, Detective Pedigo admitted that she did not ask the defendant where he went to school or question him regarding his family. She also stated that the defendant spelled his name as "ShermanBlockfshok" when signing the waiver of rights form. Regarding the inconsistent birthdays given by the defendant, Detective Pedigo said that she did not think it unusual because suspects often give different birth dates to avoid identification. She conceded that she did not explain what a court or an attorney was when reading the defendant his rights. She said that the

4

defendant did not ask to speak to an attorney and did not mention that he had an attorney. Detective Pedigo also acknowledged that she had never dealt with a mentally retarded person. She testified that although the defendant was difficult to understand on the tape, he spoke more clearly before the interview was recorded. She stated that she had interviewed other people who talked like the defendant who were not limited mentally. Though in her opinion the defendant understood the questions, Detective Pedigo conceded that the defendant's statement that he knew the victim was seven years old after she told him the victim's age could possibly indicate that the defendant was easily led.

A tape of Detective Pedigo's interview of the defendant was played for the jury. Detective Pedigo testified that a power microphone was required to tape the interview of the defendant. During the interview, the defendant mumbled several times, making it difficult to understand him. When Detective Pedigo asked the defendant what happened between him and the victim, the defendant stated, "I did it one time." When asked what he did one time, he said that he touched her "in her private" with his "dingaling," but he denied putting it inside of her. The defendant stated that he only put it on top of her "private." He asserted that the incident took place in the bedroom at his house and that the victim's sister and mother were there, but Ms. Earls was asleep. He stated that he was taking a nap when the victim came into the bedroom on him. According to the defendant, the victim asked him to get on her, to put his "thing" on her "private," and to "go up and down on her." He claimed that this was the first time she had ever asked him to do this. The defendant said that the victim took her own clothes off. When Detective Pedigo asked him whether he took his clothes off, the defendant responded that "her took it off." He later stated that his clothes were not removed and that only his pants were unzipped and that the victim unzipped them. The defendant told Detective Pedigo that he was not trying to do anything to the victim and that he did

5

not know why he did it other than because the victim requested him to do it. He also stated that he would not do it again.

For the defense, Dennis Barwick, an employee at the Orange Grove Center, testified that the center provides educational and vocational training for mentally retarded clients. He stated that the defendant attended the center from 1971 until 1982 and that he was the defendant's program director from approximately 1979 to 1982. Mr. Barwick said that while he was the defendant's program director, the defendant participated in a vocational training program as a dishwasher in two restaurants under constant direct supervision. He explained that the training program was very structured in that it involved teaching the person how to travel to their job site and instructing them step-by-step how to do their job until they became independent.

Mr. Barwick also testified regarding psychological evaluations of the defendant while a client at the Orange Grove Center that were also introduced as exhibits at trial. The Orange Grove Center's records reflect that the defendant suffers from an organic brain injury and a speech defect and show that he was hit by a car when he was a child and suffered head injuries. The records state that the defendant was referred to the center by the public school system where he was attending EMR classes. The records also show that the defendant had behavioral problems, such as causing disturbances, antagonizing students, and being overly aggressive with students, while attending a public school. An evaluation conducted in 1974 when the defendant was fourteen years old reflects that the defendant functioned on the level of a five-to-six-year-old child. It also reflects that he had an IQ of 43. Another evaluation conducted in 1976 shows that the defendant had an IQ of 58, that he had a history of underachievement, and that he attended a school for mentally retarded children in New Jersey and EMR classes in the public school system in Chattanooga. Results of the defendant's social maturity reveal that he had a social age equivalent to a child who

6

was nine years and three months old.  Testing conducted in 1980 shows that the defendant had an IQ of 57, placing him in the mild range of mental retardation.

An Orange Grove Center interoffice memo states that a newspaper report reflects that the defendant's step-father shot and killed his mother on March 3, 1981, and that the defendant witnessed the shooting.  Another interoffice memo reflects that the defendant testified against his step-father at the trial.  Mr. Barwick testified that the defendant lived with his mother until her death and then went to live with his brother, who removed the defendant from the center's programs.

On cross-examination, Mr. Barwick explained that clients at the Orange Grove Center have different levels of mental functioning and admitted that some clients could not be employed due to their mental impairments.  He also acknowledged that the defendant was among those functioning in the higher levels.  Mr. Barwick also explained that the defendant was involved in choosing his job, and he said that when he explained the nature of the job, the defendant appeared to understand.  Regarding the different IQ scores, he testified that it could be due to evaluations and scores based on different tests or because the tests were given by different examiners.

Walter Grantham, an attorney and the defendant's conservator, testified that a court appointed the defendant's brother as a conservator for the defendant in 1981 upon certification by two doctors.  The doctors certified that the defendant suffered from a permanent condition of mental retardation secondary to injuries from an automobile accident at age eight and expressed the opinion that the defendant was incapable of managing his own estate.  Mr. Grantham stated that the court removed the defendant's brother from the position because he was misusing funds and in June 1991 appointed him to serve as a conservator over the defendant's person and affairs.  He testified that the defendant's brother gave the defendant approximately fifteen dollars a

7

week and used the rest of the money, leaving the defendant at home by himself and without electricity.

Regarding his duties as a conservator, Mr. Grantham testified that he signed documents on the defendant's behalf, paid his bills, and gave him checks and food stamps. He stated that it was necessary to give the defendant his checks and food stamps on a weekly basis, because he was afraid that someone would take the defendant's money. He said that he treats the defendant, who has a speech impediment, like a six- or eight-year-old child. Mr. Grantham also expressed the opinion that the defendant did not understand that he was his attorney but rather thought of him as someone from whom he could get money. He also said that in his opinion the defendant would not be able to understand his constitutional rights. Mr. Grantham stated that the defendant did not call him when he was arrested and that he learned of the defendant's arrest approximately two weeks later. He explained that he became concerned when the defendant missed his weekly visits and when he received a call that a man who was not the defendant attempted to cash one of the defendant's checks. He said that the defendant told him that the defendant did not know why he was in jail or that he could have called Mr. Grantham. Mr. Grantham estimated that he had seen the defendant approximately seventy-five times and that the meetings lasted anywhere from one to twenty minutes.

On cross-examination, Mr. Grantham admitted that he had not visited the defendant's home. He also conceded that the defendant was able to cash the checks that he gave him. He stated that sometimes the defendant would smell and that he had to tell the defendant not to come back until he bathed. Mr. Grantham testified that the defendant rode with someone each time he came to his office. He also acknowledged that the defendant's constitutional rights could have been explained to him in the language of a six- or eight-year-old child.

8

Lisa Smith, a secretary for Walter Grantham, testified that she saw the defendant each week when he came to pick up his check and food stamps. She said that she had to explain to the defendant how to use the food stamps each time he came in the office. Ms. Smith also stated that she had received a phone call from a case worker at the food stamp office regarding the defendant's confusion about the application for food stamps. She said that the defendant's speech was difficult to understand and stated that the defendant told her that he could not read. In her opinion, the defendant acted like an eight-year-old child and would not know that he had done anything wrong until the police arrested him. On cross-examination, she admitted that she did not know whether the defendant knows whether it is right or wrong to have sex with children. She also testified that the defendant would ask for extra money for special occasions or when he needed clothes or furnishings for his home.

Thomas Ford, a clinical psychologist for Johnson Mental Health Center, testified that he conducted a psychological evaluation of the defendant to determine the defendant's sanity and competency to stand trial. He said that he met with the defendant on three occasions: January 5, January 8, and March 26, 1993. He stated that he determined that the defendant had an IQ of 55 which is in the very low end of the scoring range called the mentally deficient range. Dr. Ford testified that ninety-eight to ninety-nine percent of the population would score higher than the defendant. In Dr. Ford's opinion, the defendant functioned at approximately an eight-to-nine-year-old level. He also testified that in his opinion the defendant needed a significant amount of supervision in the community so others would not take advantage of him. He conceded that he did not know when the defendant obtained an attorney or how many times the defendant had consulted with an attorney. Dr. Ford's report was introduced at trial, and it reflects that he found that the defendant had a speech impediment and that the defendant's speech was very difficult to understand. The report also shows that the

9

defendant "exhibited concrete thinking which was consistent with past testing noted in his file, indicating Moderate Mental Retardation." The report also notes that the defendant had a poor memory for dates and events in his life.

On cross-examination, Dr. Ford testified that he spent approximately one hour obtaining information from the defendant regarding his past history for purposes of determining the defendant's sanity. Dr. Ford said that the defendant told him that he attended the Orange Grove Center, but the defendant could not provide much information about his attendance at the Orange Grove Center, other than the fact that he obtained work skills at two restaurants. Dr. Ford also testified that the defendant told him about the car accident in which he was involved. Regarding the defendant's competence to stand trial, Dr. Ford testified that the defendant told him that he knew he had been charged with the aggravated rape of the victim. According to Dr. Ford, the defendant seemed to understand what the charges meant and that the charges were serious. Dr. Ford said that the defendant asserted several times that he did not do it because he loved kids. Dr. Ford testified that the defendant also told him that he thought his attorney would do a good job for him. He conceded that he did not give the defendant an adaptive functioning test to determine the defendant's ability to function socially. Based on his evaluation of the defendant, Dr. Ford expressed the opinion that the defendant was sane at the time of the offense and competent to stand trial. He said that although the defendant was in the mild mental impairment range, the mental defect did not prevent the defendant from understanding right from wrong or impair his ability to conform his behavior to the law.

Dr. Ford testified on redirect examination that he had received information from the defendant's attorney explaining the charges against the defendant and informing him that the defendant had met with her on earlier occasions. He stated that the defendant's sanity was determined after examining the defendant on the first date

10

for approximately one hour but conceded that more than one meeting was necessary to determine the defendant's competency to stand trial because the defendant had a prior psychiatric history. Dr. Ford admitted that the defendant's attorney had informed him that the defendant had a conservator, but he did not talk to him. He also conceded that he did not talk to the defendant's family, neighbors or friends.

Wanda Pasley and Anthony Pasley, friends of the defendant, testified that the defendant had been living with them for approximately six months. Ms. Pasley stated that she takes the defendant to get his check and cash it. Mr. Pasley stated that the defendant has trouble buying things for himself because he leaves his change at the store. He also stated that Ms. Earls had taken the defendant's money from the defendant and purchased cocaine on earlier occasions. He said that the defendant had earlier asked Ms. Earls to move out of his apartment about two to three times over a two-to-three-day period and that the defendant had explained to her that his lease did not permit others to live with him. Mr. and Ms. Pasley said that the defendant is not capable of cooking, although he does help clean the house and perform yardwork. They said that they occasionally had to tell the defendant to take a bath. Ms. Pasley testified that in her opinion, the defendant acts like he is four or five years old, and both she and Mr. Pasley stated that they treated the defendant like one of their children. In Ms. Pasley's opinion, the defendant would not know that it was wrong to have sex with a child because he has a child-like mind himself.

Mr. Pasley also testified that he was present when the defendant was arrested. He said that Ms. Earls and the victim were outside talking to an officer when the defendant ran towards them, stating, "I did it. I did it." On cross-examination, Mr. Pasley conceded that he had seventeen prior convictions, including convictions for burglary, theft of property, larceny, burglary of a residence by forcible entry, armed robbery, aggravated assault and theft of an automobile.

11

The defendant testified that he was twenty-four years old and was born in 1978. He said that he started going to the Orange Grove Center when he was eight years old and that he attended the school for seven years. He stated that the American flag was red, white and blue and had three stars on it. When asked to count to twenty, the defendant could not count past ten. The defendant also testified that he could not read and write. According to the defendant, he had known the victim for approximately three days. He said that he knew he had been arrested because he had been accused of raping a seven-year-old girl, but he denied putting his "ding-a-ling" in the victim's "koochie." The defendant testified that when interviewed by the police, he told them that he was telling the truth, but he claimed that he gave the statement because he was nervous and scared. He remembered going to jail after the interview, but he stated that he thought he stayed in jail for two days and that Mr. Grantham was able to get him released on bond. The defendant said that he did not call Mr. Grantham and that he did not know that he could talk to him until after he was released.

On cross-examination, the defendant testified that he remembered telling Detective Pedigo that he put his "ding-a-ling" inside the victim's private parts, that the victim told him to take their clothes off, and that the victim unzipped his pants. The defendant said that he made these statements because they were true. He denied telling the victim not to tell anyone and recognized that it would have been a bad thing to say to the victim.

On redirect examination, the defendant stated that he did not put his "ding-a-ling" in the victim's "koochie" and denied touching the victim's "koochie." The defendant also denied putting his "ding-a-ling" on the victim's "koochie" on recross examination.

12

# I. SUFFICIENCY OF THE EVIDENCE

First, the defendant contends that the evidence is insufficient to prove beyond a reasonable doubt that he was sane at the time of the offense. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

At the time of the offense in this case, insanity was a defense to prosecution "if, at the time of such conduct, as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of law." T.C.A. § 39-11-501(a) (1991)[1]; Graham v. State, 547 S.W.2d 531, 543 (Tenn. 1977). For procedural purposes, the law presumes sanity. Brooks v. State, 489 S.W.2d 70, 72 (Tenn. Crim. App. 1972). However, if the evidence presented by any party raises a reasonable doubt as to the defendant's sanity, the presumption falls and the state must establish beyond a reasonable doubt that the defendant appreciated the wrongfulness of his conduct and had the capacity to conform his conduct to the requirements of the law. State v. Clayton, 656 S.W.2d 344, 345-46 (Tenn. 1983); Graham, 547 S.W.2d at 544.

---

[1] Pursuant to a 1995 amendment, T.C.A. § 39-11-501(a), now defines insanity as "the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature or wrongfulness" of his conduct at the time of the offense. T.C.A. § 39-11-501(a). The amendment also provides that the defendant has the burden of proving the affirmative defense of insanity by clear and convincing evidence and that an expert witness may not testify as to whether the defendant was or was not insane at the time of the offense. T.C.A. § 39-11-501(a) and (c).

The state can meet its burden through the introduction of (a) expert testimony that the defendant was sane, (b) the testimony of lay witnesses that the defendant was sane, if a proper foundation is laid, or (c) proof of acts or statements of the accused, occurring at or near the commission of the offense, which are consistent with sanity and inconsistent with insanity. Edwards v. State, 540 S.W.2d 641, 646 (Tenn. 1976); State v. Green, 643 S.W.2d 902, 913 (Tenn. Crim. App. 1982). In considering the evidence on the issue of insanity, the trier of fact is not required to accept an expert's testimony to the exclusion of sufficient lay testimony or other evidence of the defendant's actions which is not inconsistent with insanity. State v. Patton, 593 S.W.2d 913, 916 (Tenn. 1979); Edwards v. State, 540 S.W.2d at 647.

The defendant argues that the state "offered absolutely no reliable evidence to counter the consistent, powerful testimony of lay witnesses" that the defendant would not have thought it wrong to have sex with the victim. Essentially, the defendant asserts that Dr. Ford's determination that an insanity defense could not be supported is not reliable evidence of the defendant's sanity because his conclusions are based on a one-hour session with the defendant approximately six months after the arrest and incarceration of the defendant and the appointment of counsel. The defendant also contends that Dr. Ford's conclusions regarding insanity are not reliable because Dr. Ford failed to interview the defendant's conservator or anyone else who knew the defendant, including family and friends. The defendant further argues that the defendant's conduct and statement to Officer Woods that he had done something once to the victim is not indicative of the defendant's sanity because the defendant made the statement immediately after arguing with Ms. Earls. However, questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this court. State v. Cabbage, 571 S.W.2d at 835.

14

In the light most favorable to the state, the evidence establishes that although the defendant suffered from a mental defect at the time of the offense, he had the substantial capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. Dr. Ford conducted a psychological evaluation of the defendant and concluded that the defendant's mental impairment did not prevent him from understanding right from wrong and did not impair his ability to conform his conduct to the law. In addition to the expert testimony provided by Dr. Ford, lay testimony regarding the defendant's conduct at the time of the offense shows that the defendant understood the wrongfulness of his actions and was able to conform his conduct to the law. The victim stated that the defendant told her not to tell anyone, including her mother, or he would kill her. Also, when Ms. Earls asked the defendant whether he had sex with the victim, the defendant replied, "Yes, what about it." Further, the defendant told Officer Woods that he knew that he was there because of the victim and stated a couple of times that he had done something once to the victim. These facts support the jury's conclusion that the defendant was sane at the time of the offense. Under these circumstances, we hold that a rational trier of fact could have concluded that the defendant was sane beyond a reasonable doubt.

Although not raised as a separate issue, the defendant contends that the trial court should have instructed the jury on a "diminished capacity defense as it related to the intent of the defendant to commit the crime." The defendant incorrectly refers to diminished capacity as a "defense." See State v. Phipps, 883 S.W.2d 138, 143 (Tenn. Crim. App. 1994). Diminished capacity "is not a defense that absolves the accused from culpability; rather, it is a rule of evidence which allows the introduction of evidence to negate the existence of specific intent when a defendant is charged with a specific intent crime." Id. In Phipps, this court referred to the defendant's reliance on diminished capacity as being his theory of the case and stated that a defendant is

15

"entitled to an instruction upon request which outlines the defense theory of the case." 883 S.W.2d at 150 (emphasis added).

However, the record in this case does not reflect that the defendant either requested that an instruction be included in the charge or objected to the instructions as given by the trial court. A challenge based on the mere meagerness of a charge is not reversible error, absent a special request. State v. Haynes, 720 S.W.2d 76, 85 (Tenn. Crim. App. 1986). There is no merit to this subissue.

## II. COMPETENCE TO STAND TRIAL

The defendant also contends that the record is insufficient to support the trial court's finding that the defendant was competent to stand trial. He argues that the report submitted by Dr. Ford of the Johnson Mental Health Center concluding that the defendant was competent to stand trial is insufficient to establish the defendant's competency. He asserts that the facts of the case are virtually indistinguishable from those in State v. Benton, 759 S.W.2d 427 (Tenn. Crim. App. 1988), in which this court concluded that the evidence preponderated against the trial court's finding of competence. In addition, relying on Berndt v. State, 733 S.W.2d 119 (Tenn. Crim. App. 1987), the defendant contends that the trial court should have conducted an evidentiary hearing sua sponte for purposes of determining the defendant's competency to stand trial before permitting the trial to proceed. We disagree.

The standard for determining whether a defendant is competent to stand trial is set forth in Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788 (1960):

> [T]he "test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as a factual understanding of the proceedings against him."

16

Id. at 402, 80 S. Ct. at 789 (adopting the Solicitor General's suggested standard). The

Dusky standard has been adopted in Tennessee. State v. Black, 815 S.W.2d 166, 174

(Tenn. 1991); State v. Benton, 759 S.W.2d at 429; Mackey v. State, 537 S.W.2d 704,

707 (Tenn. Crim. App. 1975). In Mackey, this court stated that:

> Both Tennessee decisions and the federal constitution prohibit
> the trial of a defendant whose mental condition is such that he
> lacks the capacity to understand the nature and object of the
> proceedings against him, to consult with counsel and to assist
> in preparing his defense.

537 S.W.2d at 707 (citations omitted). The burden is on the defendant to establish his

incompetency to stand trial by a preponderance of the evidence. State v. Oody, 823

S.W.2d 554, 559 (Tenn. Crim. App. 1991). On appeal, the trial court's findings are

conclusive unless the evidence preponderates otherwise. Id.

Before trial, a petition for psychiatric evaluation was filed by the

defendant, and the trial court entered an order directing a forensic evaluation by the

Johnson Mental Health Center pursuant to T.C.A. § 33-7-301(a) for purposes of

determining the defendant's competency to stand trial and whether an insanity defense

could be supported. A letter from the Johnson Mental Health Center dated March 31,

1993, and addressed to the trial court reflects that based on their evaluation of the

defendant, the defendant was capable of defending himself. Specifically, the results of

the evaluation show that the defendant understood the nature of the legal process and

the charges against him, including the consequences that could follow. The results also

show that the defendant was able to advise his counsel and participate in his defense.

No pretrial hearing was held on the issue of competency to stand trial.

Under facts similar to this case, this court stated, "Counsel's failure to

insure that the matter of competency was settled before trial amounted to a waiver of

that issue." State v. Estes, 655 S.W.2d 179, 181-82 (Tenn. Crim. App. 1983). Also, the

defendant did not include the issue of his competency to stand trial in his motion for

17

new trial.[2]  The failure to raise a ground upon which a new trial is sought in the motion for new trial results in a waiver of the issue.  T.R.A.P. 3(e).  Therefore, we hold that the defendant has waived the issue of competency to stand trial.

In any event, the evidence does not preponderate against the trial court's determination that the defendant was competent to stand trial.  The results of the court-ordered psychiatric evaluation reflect that the defendant was competent to stand trial, unlike the case of Benton upon which the defendant relies.  The trial court was entitled to rely upon the results of the evaluation for his determination that the defendant had the capacity to understand the legal proceedings against him, to consult with counsel, and to assist in preparing his defense.  Therefore, we conclude that the trial court did not err.

### III.  SUPPRESSION OF STATEMENTS

Next, the defendant asserts that the trial court erred by denying his motion to suppress statements made by the defendant to the police.  He argues that his statement to Officer Woods that he had done something once to the victim should have been suppressed because he had not been informed of his Miranda rights at the time the statement was made.  Regarding his statement to Detective Pedigo, the defendant asserts that it should have been suppressed because the defendant was incapable of knowingly and voluntarily waiving his rights because he is mentally retarded, has an IQ of 55, and functions at the level of a four-to-nine-year-old child.  In response, the state argues that the trial court correctly determined that Miranda warnings were not necessary because the officer's actions amounted to an on-the-scene investigation and did not constitute custodial interrogation.  The state also contends that the evidence does not preponderate against the trial court's finding that the defendant knowingly and

---

[2] The motion for new trial does raise as an issue whether the trial court "erred in determining the Defendant to be competent to testify."  Competency to be a witness is governed by Tenn. R. Evid. 601.

18

voluntarily waived his rights and cooperated with the police in giving the taped confession to Detective Pedigo. We hold that the trial court did not err.

Before trial, the defendant moved to suppress statements made to Officer Woods and Detective Pedigo on August 23, 1992. The defendant alleged that the statement made to Officer Woods should be suppressed because the defendant had not been given <u>Miranda</u> warnings and because the defendant did not make the statement freely and voluntarily because of his mental state. The defendant also alleged that a second tape-recorded statement given to Detective Pedigo should be suppressed because it was not knowingly and voluntarily given in that his mental illness rendered him incapable of understanding the waiver of rights form or verbal <u>Miranda</u> warnings.

An evidentiary hearing was held on the motion to suppress. Tommy Woods, an officer for the Chattanooga Police Department, testified that he responded to a call on August 23 regarding charges of rape. He stated that approximately five to ten minutes after his arrival, the defendant walked up to him while he was outside talking to Ms. Earls and the victim and the defendant asked him why he was there. Officer Woods testified that he responded by asking the defendant why he was there. According to Officer Woods, the defendant replied that he knew Officer Woods was there because of the victim, and Officer Woods told the defendant that the victim was the reason for his presence. Officer Woods testified that he then asked the defendant what he had to do with it and the defendant stated a couple of times that he had done something with the victim once. He said that he stopped asking the defendant questions at that point and called a detective. On cross-examination, Officer Woods testified that the defendant neither gave a reason for walking up to him nor explained what he meant by the statement that he had done something to the victim once. He

19

conceded that he did not read the defendant his rights before the defendant made the statement.

Detective Pedigo testified that she received a call on August 23 regarding the rape of the victim. She said that before interviewing the victim and the defendant, she spoke to Officer Woods. She said that Officer Woods told her that the defendant walked up to him while he was questioning the victim and Ms. Earls and that the defendant asked him why the police had been called. Detective Pedigo stated that Officer Woods informed her that the defendant replied, "Yes, once," when he asked the defendant if he had done something. Detective Pedigo testified that the defendant was then brought to her office to be interviewed. She stated that she questioned the defendant about his education and he told her that he had gone to school until the eleventh grade. Detective Pedigo said that she read the defendant his Miranda rights before questioning the defendant and that Officer Woods and Steve Vaughn, an employee of the Department of Human Services, were present. She said that she explained the defendant's rights one at a time in both legal and layman's terms, and the defendant stated that he understood. Detective Pedigo stated that immediately after the defendant told her that he understood everything, he stated, "I only did it once, and I won't do it anymore." She said that although the defendant's speech was slurred, she believed the defendant understood what the waiver of rights form meant.

Detective Pedigo testified that she then began interviewing the defendant, and she tape recorded the interview of the defendant. She stated that once she turned on the tape recorder, the defendant's speech became worse and a power microphone was necessary. She stated that the defendant did not object to the recording of his statement although she admitted that the defendant appeared to be intimidated by the recorder. Detective Pedigo testified that she had to stop the interview several times to ask the defendant to speak more distinctly. According to Detective Pedigo, the

20

defendant appeared to understand her questions during the interview. She said that during the interview she was sitting behind her desk with the defendant and Vaughn sitting across from her and Officer Woods leaning on a credenza near her desk. She stated that Officer Woods was in uniform and had his gun and handcuffs with him. The tape recording of the defendant's interview was then played for the trial court.

On cross-examination, Detective Pedigo conceded that she wrote in her report that Officer Woods attempted to clarify the defendant's "Yes, once" response by asking the defendant whether he had done something with the victim and that the defendant replied again, "Yes, once." Regarding the waiver of rights form, Detective Pedigo testified that the defendant's signature is in print and spelled "Blackfshock." She also stated that in interviewing the defendant, she noticed that the defendant had a speech impediment, that his grammar was poor, and that his language was child-like. She said that the defendant might have been slightly limited, although she asserted that she had interviewed other people like the defendant and that the conduct was normal for some people. Detective Pedigo admitted that she was not aware that the defendant had attended the Orange Grove Center or any other special education classes or that the defendant suffered head injuries from a car accident when he was a child. She also said that she did not know that a conservator had been appointed for the defendant. Detective Pedigo testified that she did not ask the defendant whether he understood what the terms "lawyer" or "court" meant but rather assumed that the defendant understood these terms because he had a prior criminal record. She stated that the defendant did not know his social security number and gave two different birth dates: March 1959 and March 1968.

Walter Grantham, the defendant's conservator, testified that he was appointed as a conservator over the defendant's person and affairs in June 1991, replacing the defendant's brother. He stated that two doctors certified the defendant as

21

being mentally incapable of managing his own affairs because of his mental retardation that was secondary to an injury occurring at age eight. He said that the doctor's certification reflected that the defendant's condition was permanent. Mr. Grantham testified that the defendant lived with his mother until 1981 when she was murdered.

Mr. Grantham also stated that the defendant is disabled because of his mental condition and receives social security income, supplemental security income and food stamps. He said that the defendant is difficult to understand because of a speech impediment. Mr. Grantham stated that he believed that the defendant is easily influenced in that the defendant would tell him things that other people told him to say and that he would allow people to live with him in violation of his lease. He said that the defendant's brother also took advantage of the defendant when serving as the defendant's conservator in that he only gave the defendant fifteen to twenty dollars a month and allowed the defendant to live without food and electricity. Mr. Grantham testified that the defendant is compliant when faced with an authority figure and that he would do or say almost anything if requested. He expressed the opinion that he could be convinced to give a confession to the police, although he admitted that he had no evidence that someone told him to make the statements. He also admitted that he found the tape to be disturbing as to whether the defendant had been told what to say because he believed that the defendant was capable of remembering what to say on a short-term basis.

Mr. Grantham testified that he did not know the defendant was in jail for over two weeks but became suspicious when the defendant did not come to his weekly meetings. He stated that the defendant did not understand that he had money for the defendant to post his bond and that he did not know why he was in jail. Mr. Grantham testified that when he asked the defendant why he did not call him, the defendant told him that he did not know that he could. In Mr. Grantham's opinion, the defendant does

22

not understand that he is an attorney even though he has weekly contact with the defendant. He stated that he was not sure whether the defendant could read or write but that his employees had told him that the defendant was illiterate. Mr. Grantham testified that it was necessary to explain things to the defendant sentence by sentence in the most basic manner and that he often had to repeat things. He also expressed the opinion that the defendant would not be capable of understanding Miranda rights or the waiver of rights form even in the manner used by Detective Pedigo. According to Mr. Grantham, the defendant is not able to waive his rights knowingly and voluntarily.

On cross-examination, Mr. Grantham testified that he had met with the defendant approximately seventy-five times for five to twenty minutes each visit. He said that he had to give the defendant his checks and food stamps on a weekly basis. He admitted that he had not visited the defendant at his home. Mr. Grantham also said that he was aware that the defendant had worked for his uncle cleaning at a convenience store. In Mr. Grantham's opinion, the defendant would know that raping a seven-year-old girl was wrong. He testified that he represented the defendant for charges of criminal trespass, that the defendant denied any wrongdoing, and that the defendant went to court on the charges, but the charges were dismissed.

Lisa Smith, a secretary for Mr. Grantham, testified that she sees the defendant on a weekly basis when the defendant picks up his check and food stamps. She said that she did not think that he could read but she knew that the defendant bought his own groceries. She stated that she had to explain how to use the food stamps each time she gave them to him. She also testified that the defendant reminds her of an eight- or nine-year-old child.

Dennis Barwick testified that the defendant was employed through the Orange Grove Center's training program at two restaurants as a dishwasher. Mr.

23

Barwick testified that the defendant could not read. The defendant's records from the Orange Grove Center were then introduced.

The psychological report prepared by the Johnson Mental Health Center was also introduced. The recommendation contained in the report is that the defendant needed a significant amount of supervision in the community so that others would not take advantage of him.

The trial court denied the defendant's motion to suppress the defendant's statements to police. Regarding the statement made by the defendant to Officer Woods, the trial court concluded that the defendant's rights were not violated because a custodial interrogation did not take place. It found that Officer Woods did not know that the defendant was a suspect, that the investigation had not focused on the defendant, and that Officer Woods stopped questioning the defendant after the defendant made the statement. Also, the trial court concluded that it believed Officer Woods' testimony over the report. In denying the motion to suppress, the trial court held that Officer Woods' responsive question to the defendant regarding why the defendant was there amounted to an on-the-scene investigation rather than a custodial interrogation. At the motion for new trial, the trial court stated that Officer Woods was not required to inform the defendant of his Miranda rights because the defendant was not under suspicion and the focus of the investigation when the defendant made the statement. The trial court described the statement as a "spontaneous utterance" as opposed to a response to custodial interrogation by a police officer.

The trial court also concluded that the defendant's statements to Detective Pedigo were not obtained in violation of his constitutional rights. In reaching this conclusion, the trial court recognized that the defendant had a mental impairment but noted that the defendant was able to function in society, although at a lower level.

24

The trial court also relied upon the results of the court-ordered psychological evaluation. In determining the defendant's level of understanding, the trial court also found relevant the defendant's statement to Detective Pedigo in that the responses to the questions show that the defendant volunteered the information. The trial court concluded that the defendant voluntarily waived his rights and gave the statement because he cooperated with the police. The trial court also determined that the waiver and statement were knowingly made because Detective Pedigo explained the defendant's rights by breaking them down in such a way that the defendant could understand them.

On appeal, the trial court's findings of fact and conclusions of law at the conclusion of a suppression hearing will be upheld unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The defendant bears the burden of demonstrating that the evidence preponderated against the trial court's findings. Id.

## A. CUSTODIAL INTERROGATION

First, the defendant alleges that the trial court erred by denying his motion to suppress the defendant's statement made to Officer Woods because he was not advised of his Miranda warnings. The state asserts that the trial court properly refused to suppress the defendant's statement because the defendant was not subjected to custodial interrogation and therefore Miranda warnings were not required. We agree.

In Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), the United States Supreme Court concluded that statements made by a defendant during the course of custodial police interrogation are inadmissible as evidence against the defendant unless the state demonstrates that the defendant was advised of and waived the following constitutional rights:

(1) the right to remain silent;

25

(2) any statement made may be used against the defendant;

(3) the right to the presence of an attorney; and

(4) if the defendant cannot afford an attorney, one will be appointed for him or her before questioning if requested by the defendant.

Id. at 444, 86 S. Ct. at 1612; see also State v. Bush, 942 S.W.2d 489, 499 (Tenn. 1997); State v. Anderson, 937 S.W.2d 851, 853 (Tenn. 1996). However, police officers are required to inform the defendant of these rights before custodial interrogation only. Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. Custodial interrogation entails "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. The issue of whether a person is in custody is decided under an objective test. Berkemer v. McCarty, 468 U.S. 420, 422, 104 S. Ct. 3138, 3151 (1984); Anderson, 937 S.W.2d at 854.

In Anderson, our supreme court set forth several factors, although not an exclusive list, that are relevant to the objective analysis of "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest" for purposes of Miranda:

the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on the movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview.

26

937 S.W.2d at 855. The court stated that the determination of whether a person is in custody for <u>Miranda</u> purposes is a very fact specific inquiry for which the trial court is especially suited. <u>Id</u>.

Considering the totality of the circumstances in the record before us, we hold that the evidence does not preponderate against the trial court's decision that the defendant was not in custody when he made the statement to Officer Woods. The defendant initiated contact with Officer Woods by walking up to Officer Woods and asking him why he was there. When Officer Woods asked him why he was there, the defendant replied that he knew that Officer Woods was there because of the victim, although the defendant had not been told about the nature of Officer Woods' presence. When Officer Woods told the defendant that he was correct and asked the defendant what he had to do with it, the defendant stated a couple of times that he had done something to the victim once. Officer Woods then stopped questioning the defendant.

Also, Officer Woods was the only officer present when the defendant made the statement, and he did not tell the defendant that he was suspected of the crime or explain what had happened to the victim. Although Officer Woods did not tell the defendant that he was free to leave, Officer Woods also did not tell the defendant that he could not leave, and the defendant did not try to leave at any point. The defendant was not restrained or his movement limited in any way. Under these circumstances, a reasonable person in the defendant's position would not have considered himself or herself deprived of freedom of movement to a degree associated with a formal arrest. Therefore, we conclude that the trial court correctly concluded that the defendant was not subjected to custodial interrogation and thus not entitled to <u>Miranda</u> warnings. It was not error for the trial court to deny the defendant's motion to suppress his statement made to Officer Woods.

## B.  WAIVER OF RIGHTS

The defendant also contends that the trial court erred by denying his motion to suppress the statement to Detective Pedigo because he was not competent to waive his Miranda rights.  He argues that because he is mentally retarded, has an IQ of 55, and functions at the level of a four-to-nine-year-old child, he is unable to waive his rights knowingly and voluntarily .  The state asserts that the evidence does not preponderate against the trial court's finding that the defendant knowingly and voluntarily waived his rights and cooperated with the police in giving the taped statement.  We agree.

Before a defendant can knowingly and voluntarily waive his Miranda rights, the defendant must be "adequately and effectively apprised of his rights."  State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992).  The defendant may waive his constitutional rights as long as the waiver is made "voluntarily, knowingly, and intelligently."  Id.  The state has the burden of proving the waiver by a preponderance of the evidence.  State v. Bush, 942 S.W.2d at 500.  In determining whether a defendant has validly waived his or her Miranda rights, courts must look to the totality of the circumstances.  Id.; State v. Middlebrooks, 840 S.W.2d at 326.  Although the defendant's age, education and mental retardation are relevant, no single factor is determinative of the waiver issue.  State v. Benton, 759 S.W.2d at 431.  When the voluntariness of a statement given to police is challenged based on the defendant's competency to waive the rights provided by Miranda, the determinative issue is "whether the defendant had the capacity in the first place to form a will of his own and to reject the will of others."  Id.

In support of his argument, the defendant relies upon State v. Benton, 759 S.W.2d 427 (Tenn. Crim. App. 1988).  The defendant argues that the facts of his case are virtually indistinguishable from those in Benton.  We disagree.  Several facts make

28

this case distinguishable from Benton. Unlike the defendant in Benton, whom a psychiatric social worker and a psychiatrist found to be incompetent to stand trial and to answer questions by a police officer, the defendant in this case was found to be competent to stand trial pursuant to a court-ordered psychological evaluation. Also, the defendant was able to respond to questions during the evaluation. The defendant in this case has been able to live by himself for several years. Although the defendant is limited mentally similar to the defendant in Benton, low IQ scores are not determinative of a defendant's ability to waive his rights. See State v. Haynes, 720 S.W.2d at 84.

The record in this case reflects that Detective Pedigo read the defendant his rights before questioning the defendant by breaking the rights down into basic parts and by explaining each right individually. Detective Pedigo testified that the defendant stated that he understood his rights before the defendant stated that he had done something once but would not do it again. The defendant signed the waiver of rights form. According to Detective Pedigo, the defendant appeared to understand what the form meant. As the trial court correctly noted, the defendant was able to comprehend and answer the questions asked of him during the interview and to elaborate his answers. The record also does not demonstrate that the defendant was threatened or coerced into giving a statement. We hold that the evidence does not preponderate against the trial court's ruling that the defendant knowingly and voluntarily waived his constitutional rights. The trial court properly admitted the statement.

## IV. PETITION FOR INVOLUNTARY CARE AND TREATMENT

The defendant contends that the trial court erred in denying his petition for involuntary care and treatment as a mentally retarded offender and, instead, sentencing him to the Department of Correction. The state responds that the trial court did not have the authority to order a sentence to the Department of Correction to be served in a mental health or retardation facility.

After trial but before the sentencing hearing, the defendant filed a petition for involuntary care and treatment in a secure facility for the mentally retarded. He alleged that he qualified as a "mentally retarded offender" as defined in T.C.A. § 33-5-303 and attached a copy of the Johnson Mental Health Center's psychological evaluation. In the petition, the defendant claimed that he needed care, training or treatment and that the failure to provide a secure facility would create a likelihood of causing serious harm, as defined under T.C.A. § 33-6-104, because of his mental retardation. He also alleged that less drastic alternatives to judicial commitment were unsuitable. The petition asserted that the defendant was unable to provide a certificate of two qualified mental retardation professionals, as required by T.C.A. § 33-5-305, due to his indigency, and it requested that the trial court order an examination.

At the conclusion of the sentencing hearing, the trial court sentenced the defendant to eight years as a Range I, standard offender in the custody of the Department of Correction. The trial court denied the defendant's petition for involuntary care and treatment, stating that although it believed that the defendant needed to be housed in a facility for the mentally retarded, it lacked jurisdiction to order the defendant to serve his sentence in such a facility. The trial court reasoned that T.C.A. § 33-5-305 provides authority for the commitment of the defendant before trial only. The trial court noted that the Department of Correction had jurisdiction to transfer the defendant to such institution under T.C.A. § 33-3-402, and concluded that it could not order the Department of Correction to transfer the defendant. However, the trial court offered to submit a letter to the Department of Correction recommending that the defendant be transferred.

The defendant states that he is a mentally retarded offender, which is defined as "a person with significantly sub-average general intellectual functioning which originates during the developmental period and is associated with an impairment

of adaptive behavior, who is a defendant at any stage in the criminal or juvenile justice system." T.C.A. § 33-5-303(1). He asserts that because he is a mentally retarded offender, the trial court should have committed him to a facility operated by the Department of Mental Health and Mental Retardation pursuant to T.C.A. § 33-5-305, which provides as follows:

> Procedure for Commitment.
>
> (a) IF AND ONLY IF
>
> (1)(A) a juvenile court determines in a delinquency proceeding, on the basis of an evaluation under § 37-1-128(c) or § 37-1-135, that a minor is mentally retarded, OR
>
> (B) a circuit, criminal, or general sessions court determines on the basis of an evaluation under § 33-7-301(a) either that a criminal defendant is incompetent to stand trial due to mental retardation or, with the agreement of defense counsel, that the defendant is competent to stand trial but that failure to provide a secure facility would create a likelihood to cause the defendant serious harm by reason of mental retardation, OR
>
> (C) a circuit or criminal court enters a verdict of not guilty by reason of insanity on a capital offense,
> THEN
>
> (2) the district attorney general or the defense attorney may file a complaint to require involuntary care and treatment of the mentally retarded person under this section, AND
>
> (3) notwithstanding § 33-3-603, only the juvenile court which has jurisdiction of the minor or the circuit or criminal court before which the person's criminal case is pending or which would hear the case if the defendant were bound over to the grand jury has jurisdiction to hear a complaint filed under this section.
>
> (b) IF AND ONLY IF
>
> (1) a person is mentally retarded, AND
>
> (2) the person poses a substantial likelihood of serious harm as defined in § 33-6-104(a) because of the mental retardation, AND
>
> (3) the person needs care, training, or treatment because of the mental retardation, AND
>
> (4) all available less drastic alternatives to judicial commitment are unsuitable to meet the needs of the person, AND

(5) the district attorney general or the defense attorney files a complaint to require involuntary care and treatment under subsection (a),

THEN

(6) the person may be judicially committed to involuntary care and treatment in the custody of the commissioner in proceedings conducted in conformity with chapter 3, part 6 of this title.

(c) No defendant may be judicially committed under this section unless the commissioner designates licensed physicians or licensed psychologists designated as health service providers who file in the commitment proceeding two (2) certificates of need for care and treatment certifying that the defendant satisfies the requirements of subdivisions (b)(1)-(4) and showing the factual foundation for the conclusions on each item.

(d) If and only if a court determines that a person poses an immediate substantial likelihood of serious harm and commits the person under this section, the commissioner shall designate a licensed state facility to admit the person. Otherwise a judicially committed person does not come into the custody of the commissioner until the commissioner determines that the state has an available suitable accommodation.

(Emphasis added).

The defendant argues that because the definition of a "mentally retarded offender" as provided in T.C.A. § 33-5-303(1) refers to "a defendant at any stage in the criminal . . . or juvenile system," the judicial commitment procedure under T.C.A. § 33-5-305 also applies to a defendant who has been found guilty. In support of his argument, the defendant asserts that the language contained in T.C.A. § 33-5-306 contemplates that a trial court may commit a mentally retarded offender to appropriate treatment facilities at any stage of the criminal proceedings, even after conviction. Under T.C.A. § 33-5-306, a person shall receive credit towards his or her sentence for time spent in the custody of the Commissioner of the Department of Mental Health and Mental Retardation when the person receives evaluation, training or treatment services "in connection with a criminal charge or conviction, wherever incarcerated . . . ." (Emphasis added).

In response, the state argues that the trial court properly determined that T.C.A. § 33-5-305 deals exclusively with pretrial commitment of mentally retarded offenders. The state notes that T.C.A. § 33-5-303 specifically provides that the mentally retarded offender definition applies "unless the context requires otherwise." It argues that the definition does not apply because T.C.A. § 33-5-305 refers only to offenders who have not been convicted of the charged offense. In support of its argument, the state asserts that T.C.A. § 33-5-308 provides for periodic evaluations of persons committed under T.C.A. § 33-5-305 including "an assessment of the person's present condition and prospects for restoration to competence to stand trial . . . ." (Emphasis added).

The state also asserts that T.C.A. § 33-5-306 refers instead to the situation where a defendant is restored to competence and then tried and convicted for the offense charged. The state argues that the trial court properly concluded that the proper procedure for placement in a Mental Health and Mental Retardation facility after conviction is through a transfer by the Department of Correction under T.C.A. § 33-3-402. Pursuant to T.C.A. § 33-3-402, the director of an institution of the Department of Correction shall order a transfer based on a written report of a licensed physician or a licensed clinical psychologist that (1) the defendant is mentally ill or mentally retarded and (2) the defendant needs residential care and treatment for his or her condition that cannot be provided by the Department of Correction but can be provided by an appropriate residential program of the Department of Mental Health and Mental Retardation.

We agree with the defendant's contention that the trial court may order a defendant who has been convicted of an offense to be committed pursuant to T.C.A. § 33-5-305. At first glance, the provisions under T.C.A. § 33-5-305(a) appear to allow for

the involuntary care and treatment of an adult, mentally retarded offender either before trial or upon a verdict of not guilty by reason of insanity only. However, the reference to "a defendant at any stage in the criminal . . . justice system" contained in the mentally retarded offender definition under T.C.A. § 33-5-303 reflects that the legislature intended that the procedures for commitment set forth in T.C.A. § 33-5-305 be available for a mentally retarded defendant at any stage of the proceedings, including sentencing. Moreover, the trial court retains full jurisdiction over a defendant sentenced to the Department of Correction during the time the defendant is incarcerated and awaiting transfer to the department. T.C.A. § 40-35-212(d). Pursuant to T.C.A. § 40-35-212(d), the trial court's jurisdiction continues until the defendant is actually transferred to the physical custody of the department. Accordingly, we hold that a trial court may commit a defendant pursuant to T.C.A. § 33-5-305, even though the petition for involuntary care and treatment was filed after conviction.

However, the provisions under T.C.A. § 33-5-305 may not be used by the trial court to impede the transfer of a defendant to the physical custody of the Department of Correction. The provisions of T.C.A. § 33-5-305 may not be used to impede the Department of Correction's jurisdiction over the defendant. In this regard, the trial court correctly determined that it lacked the authority to order the Department of Correction to transfer the defendant to the Department of Mental Health and Mental Retardation. Upon transferring the defendant to the Department of Correction, the trial court lost jurisdiction to order the commitment of the defendant. See T.C.A. § 40-35-112(d). Therefore, the defendant is not entitled to relief.

34

## V. SENTENCING

The defendant asserts that he should have been sentenced as an especially mitigated offender pursuant to T.C.A. § 40-35-109. He argues that the trial court erroneously sentenced him as a Range I, standard offender because (1) he had no prior felony convictions, (2) two mitigating factors applied, and (3) the trial court improperly applied enhancement factor (4), the victim was particularly vulnerable because of age or physical or mental disability. We hold that the trial court erroneously determined that an enhancement factor applied. However, we affirm the sentence imposed by the trial court based on the use of enhancement factor (15), regarding the abuse of a position of private trust.

Appellate review of sentencing is <u>de novo</u> on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d) and -402(d). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and

35

> articulate how the mitigating and enhancement factors have
> been evaluated and balanced in determining the sentence.
> T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210 (1990); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

Pursuant to T.C.A. § 40-35-109, the trial court may designate a defendant as an especially mitigated offender if the defendant has no prior felony convictions and the court finds mitigating, but no enhancement factors. The decision to sentence the defendant as an especially mitigated offender rests in the discretion of the trial court. See T.C.A. § 40-35-109, Sentencing Commission Comments; State v. Buttrey, 756 S.W.2d 718, 722 (Tenn. Crim. App. 1988).

No witnesses testified at the sentencing hearing. The presentence report reflects that the then thirty-four-year-old defendant asserted that he had completed the eleventh grade, although he did not know where. The defendant was also unable to provide his age, date of birth, names and addresses of relatives or his social security number. The report also shows that the defendant could not write. Regarding the defendant's employment history, the presentence report states that the defendant had worked at a restaurant, although he was currently mentally incapable of working. The report reflects that the defendant does not have a prior criminal history.

In assessing whether the defendant should be sentenced as an especially mitigated offender, the trial court determined that the following mitigating factors applied: (1) the defendant suffered from a mental condition that significantly reduced his culpability for the offense, and (2) the defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his conduct. See T.C.A. § 40-35-113(8) and (11). The trial court also concluded that the victim of the offense was particularly vulnerable because of her age or physical or mental limitations. See T.C.A. § 40-35-114(4). Because the trial court determined that an enhancement factor applied, it declined to sentence the defendant as an especially mitigated offender but imposed the minimum sentence within Range I. Also, the state agreed that the minimum sentence was appropriate.

The defendant argues that the trial court improperly applied enhancement factor (4) because the victim's age is an essential element of aggravated sexual battery. Although age is an element of the offense of aggravated sexual battery involving a child under the age of thirteen, see T.C.A. §§ 39-13-502(a)(4) (1991) and -504(a) (1991),[3] factor (4) may be used to enhance a sentence if the evidence shows that the victim's natural physical and mental limitations render the victim particularly vulnerable due to age. State v. Kissinger, 922 S.W.2d 482, 487 (Tenn. 1996); see also State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993) (factor (4) may be used to enhance conviction for aggravated rape involving a victim under the age of thirteen). "[T]he vulnerability enhancement relates more to the natural physical and mental limitations of the victim than merely to the victim's age." Adams, 864 S.W.2d at 35.

---

[3] Pursuant to a 1993 amendment, T.C.A. § 39-13-504 now contains the circumstances by which the offense constitutes aggravated sexual battery, as opposed to referring to the aggravated rape statute for the applicable circumstances.

37

However, in making its determination regarding the application of factor (4), the trial court should consider whether the proof establishes that because of the victim's age or physical or mental attributes, the victim was unable to resist, summon help or testify at a later date. Kissinger, 864 S.W.2d at 487; Adams, 864 S.W.2d at 35; State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997). The state bears the burden of proving the victim's limitations that render him or her particularly vulnerable, in addition to the victim's age. Adams, 864 S.W.2d at 35. It cannot be presumed that the victim was particularly vulnerable based solely on the victim's age. Poole, 945 S.W.2d at 98.

In this respect, the state concedes that the proof at trial failed to show how the victim was particularly vulnerable because of her age. We agree that the evidence does not support the trial court's application of factor (4).

The state argues, however, that the record supports the application of enhancement factor (15), abuse of a position of private trust that significantly facilitated the commission of the offense. See T.C.A. § 40-35-114(15). In conducting a de novo review of the record, an appellate court may determine that the record supports the application of an enhancement factor not applied by the trial court. State v. Pearson, 858 S.W.2d 879, 885 (Tenn. 1993). Application of factor (15) requires a finding that the defendant occupied a position of trust, either public or private. T.C.A. § 40-35-114(15); Kissinger, 922 S.W.2d at 488-89. In Kissinger, our supreme court stated:

> The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith. If the evidence supports that finding, then the court must determine whether the position occupied was abused by the commission of the offense.

Id. at 488.

38

Applying the principles set forth in <u>Kissinger</u>, we hold that the evidence establishes that the defendant occupied and abused a position of private trust. Similar to the defendant in <u>Kissinger</u>, the defendant developed a friendly relationship with the victim's mother. <u>Id</u>. at 485, 489. Also, the victim, along with her mother and two sisters, lived with the defendant about two months before moving out in June, approximately three months before the offense occurred. <u>Id</u>. The victim testified that she walked into the defendant's apartment and asked him for a drink of water. Rather than giving her a drink, the defendant took the victim into the bedroom, removed their clothes and inserted his penis into the victim's vagina. The victim also told Detective Pedigo that she was in the defendant's bedroom playing with toys when the offense occurred. Based upon these facts, we conclude that the defendant occupied a relationship with the victim that promoted confidence, reliability and faith in him, such as would motivate her to approach and enter his apartment without fear.

Thus, although the trial court incorrectly applied enhancement factor (4), the evidence supports the application of factor (15). The defendant does not meet the minimum criteria for being sentenced as an especially mitigated offender pursuant to T.C.A. § 40-35-109. Under these circumstances, we hold that the defendant is not eligible for sentencing as an especially mitigated offender.

In consideration of the foregoing and the record as a whole, the judgment of conviction is affirmed.

_____
Joseph M. Tipton, Judge

39

CONCUR:


_____
Gary R. Wade, Judge


_____
Robert E. Burch, Special Judge